IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOYCE DALTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 14-cv-1160-MJR-PMF |
| ) | |
| BOARD OF EDUCATION FOR, ) | |
| MOUNT VERNON TOWNSHIP ) | |
| HIGH SCHOOL DISTRICT 201, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

Joyce Dalton began working as an assistant principal at the Mt. Vernon Township High School in August 2010. In March 2013, Dalton resigned, purportedly because the superintendent told her that if she didn't resign she would be terminated by the Board at its upcoming hearing and face other repercussions linked to a discrimination charge she started with the Equal Employment Opportunity Commission. In 2014, Ingram filed suit against Mt. Vernon Township High School in this Court, claiming that the school discriminated against her based on her race and gender and retaliated against her for filing a charge with the Commission. The Board has now moved for summary judgment on all of Dalton's claims, arguing that she has insufficient evidence to make out a discrimination or retaliation claim. For the reasons stated below, the Board's motion is granted in part and denied in part.

1

## Background

Dalton, an African American female, was hired in August 2010 by the Board to serve as the Assistant Principal for Attendance, Student Discipline, and Campus Supervision at the Mt. Vernon Township High School. Dalton remained at Mt. Vernon until her resignation in March 2013. Dalton was one of five assistant principals working at the high school—the school assigned each assistant principal to various areas, with Dalton responsible for security, attendance, discipline, and other related matters. When Dalton first began working at the school, Dalton's supervisor was Principal Ron Daniels, but that changed in July 2011, when Daniels departed and Wesley Olson was hired to serve as principal in his stead. Daniels and Olson reported to the district superintendent, Dr. Michael Smith, throughout Dalton's tenure.

The circumstances (and motivators) of Dalton's departure depend upon who you ask. The Board flags a number of problems with Dalton's job performance at the school, one localized to 2010 and many occurring after Principal Olson's arrival in 2011. When Dalton began working at the school in 2010, she interpreted the dress code to mean that camouflage was prohibited because it could be viewed as a gang symbol—and based on that interpretation she sent students home from school to change into more appropriate attire. That interpretation didn't fly well with parents and students in southern Illinois, and parent complaints drew community and local media attention. The complaints led the superintendent to discuss the matter with Dalton and advise her that, while she was to use her judgment in enforcing the high school's dress code, she should be careful about creating a gang problem where no known problem existed.

The Board claims that Dalton's problems continued after Principal Olson was hired in July 2011. Olson received some additional complaints related to Dalton's interaction with students and parents in 2011: he investigated them, allegedly spoke to Dalton about them, and set some of them aside as frivolous. That said, he determined that others—namely a few complaints linked to Dalton's communication with parents and one complaint linked to a physical altercation with a student—had merit.

The Board says that the complaints about Dalton continued into the 2012 to 2013 school year, reaching an apex when Dalton approached a school board member and the school's resource officer to get out of a traffic ticket she received in mid-2012. All involved dispute large portions of Dalton's contact with officials concerning the ticket: Hawkins testified that Dalton offered him $100 to get her out of the ticket; Dalton admits that she approached him but characterized the bribe as a joke; Olson suggests that he regarded the event as bad judgment but admits that the bribe could have been a joke; and the superintendent says that he took Dalton's exchanges with Hawkins and the board member very seriously, characterizing her discussions as poor judgment.

For her part, Dalton says that the complaints against her were largely groundless, and that she was exposed to discrimination based on her gender and race since Olson took over as principal. She claims that Olson made constant comments from 2012 onward that he wanted a male in the attendance office: in April 2012, he said that the male coach of the football team should be moved to that office; and in November 2012, he said that the female attendance clerk should be moved to another position because they needed a man in that office. Dalton also says that Olson often

3

referred to African Americans as "you people" when speaking with Dalton—he referred to African Americans as "you people" when Dalton complained about a secretary's treatment of an African American student, and he would refer to African American students as "you people" when discussing them generally with Dalton

Olson's comments were not the only thing Dalton found objectionable—she also claims that she was treated differently than other assistant principals by Olson and other officials throughout her tenure at Mt. Vernon High School.  For one, a video camera was installed in Dalton's office but no one else's in 2012.  When Dalton asked why the camera was installed, Olson laughed and told her that she was a "tough one," and the superintendent told her that the camera was for her safety because she dealt primarily with discipline issues.  Dalton found that explanation curious, given that other employees often dealt with student discipline but didn't have cameras installed in their offices or duty stations.  In addition, Dalton claims that Olson reassigned many of her responsibilities and often overturned her decisions—something he didn't do to other principals.  Once more, Dalton claims that Olson and possibly others denied her core competency training that other assistant principals received.

On November 19, 2012, Principal Olson sent the superintendent a memo documenting Dalton's purported deficiencies, including problems related to Dalton's timeliness, her availability, her communications with parents and students, and other matters.  Dalton says she challenged the bona fides of that letter and asked to speak to the Board, but she was rebuffed, and the Board took that information into account when it decided to give all other assistant principals pay increases but her.

4

In February 2013, the superintendent prepared a summative performance evaluation for Dalton, receiving input along the way from Olson and other assistant principals. The superintendent gave the report to Dalton sometime in February 2013—precisely when the parties seem to dispute—and told her that he would recommend to the Board that her contract not be renewed for the following year. After she received the evaluation, Dalton allegedly contacted the superintendent, again challenged the accuracy of the statements in the evaluation, and claimed that Principal Olson was targeting her for discriminatory reasons. Dalton also contacted the Equal Employment Opportunity Commission and filled out a charge questionnaire. On February 27, 2013, Dalton followed up by submitting a letter to the superintendent, telling him that she would present her evidence to the Board at its March 2013 meeting and would request resignation in lieu of termination if the Board decided to terminate her. The superintendent told her it would be a waste of time to go to the Board, but if she resigned and spared all the trouble, he would help her find other employment.

On the same day that Dalton submitted her follow-up letter, the Equal Employment Opportunity Commission sent a notice of charge of discrimination to the school, seemingly prompted by Dalton's February 2013 charge questionnaire. According to Dalton, that led Smith to meet with her on March 7, 2013: he confronted her regarding her agency charge; told her that because she had filed the charge he could no longer accept her provisional February 27, 2013 letter of resignation; explained that he would prepare a letter of resignation that Dalton must sign before the Board meeting instead if she wanted to resign; and told her that pursuing the charge with the

5

Commission would hurt her career given his contacts in southern Illinois. Dalton received the letter allegedly prepared by the superintendent on March 15, 2013, and signed it. That same day, she submitted her finalized charge to the Commission. Dalton was ultimately replaced by Rowdy Fatheree, a Caucasian male.

On July 29, 2014, the Commission sent Dalton a right to sue letter, telling her that it was unable to determine whether there was a violation. Dalton then filed a complaint against Mt. Vernon High School in federal court, alleging race discrimination, gender discrimination, and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. She amended the complaint once to name the Board of Education for Mt. Vernon instead of the high school. Discovery has concluded and the Board has moved for summary judgment, claiming that Dalton has no actionable discrimination or retaliation claims.

## Discussion

This case presents a thicket of motions: the Board has moved to dismiss the amended complaint, has moved for summary judgment, and has moved to strike a declaration that Dalton attached to her response to the Board's motion for summary judgment. The Court granted in part and denied in part the Board's motion to dismiss: the Court ruled that Dalton's § 1981 claims should be dismissed for want of custom or policy allegations directed at the Board, but that Dalton's amended complaint was timely and that an exhaustion dismissal was not appropriate at the motion to dismiss stage (largely due to the imprecision of the Board's arguments). The Court also denied the Board's motion to strike, finding that the supplemental declaration didn't squarely

contradict Dalton's deposition testimony and that the letter sought to be stricken, which wasn't disclosed by Dalton during the course of discovery, was likely in the Board's possession before the case even started. With those points disposed of, the only remaining motion is the Board's request for summary judgment, which primarily takes issue with the merits of Dalton's Title VII retaliation and discrimination claims.

Summary judgment is proper on one or more of a party's claims if the evidence shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, **743 F.3d 1101, 1105 (7th Cir. 2014).** In evaluating whether there is a genuine issue as to a material fact, the Court must construe the facts in the light most favorable to the non-movant, and draw all legitimate inferences and resolve doubts in favor of that party. *Nat'l Athletic Sportswear, Inc.*, **528 F.3d 508, 512 (7th Cir. 2008).** If after doing so no reasonable jury could find for the non-movant on his claim, summary judgment on that claim is proper; if the jury could find for the non-movant on that claim, it must proceed. *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, **16 F.3d 832, 836 (7th Cir. 1994).**

Dalton's first claim for relief, at least as narrowed by her responses to the Board's motion for summary judgment, is that the Board discriminated against her by denying her training provided to other employees at the high school. The Board maintains that the training claim can't make it to trial because Dalton hasn't offered evidence showing that the denial of training had a material impact on her job, and its criticisms are well taken. It's important to remember that Title VII doesn't forbid every act of discrimination that an employer might visit on an employee—the action must be "with

7

respect to [the employee's] compensation, terms, conditions, or privileges of employment." **42 U.S.C. § 2000e-2(a)(1).** In other words, whatever is done to the employee must rise to the level of a "tangible employment action" or must qualify as "materially adverse," lest Title VII render all dirty looks from an employer grist for a federal case. *Herrnreiter v. Chi. Housing Authority*, **315 F.3d 742, 744 (7th Cir 2002).**

The "material" or" "tangible" requirement in the statute means that a denial of training, in and of itself, is not actionable under Title VII. The denial must, as the cases say, "tend to affect" one's employment status or benefits, *Shackelford v. Deloitte & Touche, LLP*, **190 F.3d 398, 407 (5th Cir. 1999)**; or cause "material harm" to an employee's opportunities for growth or advancement, *Hill v. Rayboy-Brauestein*, **467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006)**. The Board argued that Dalton had no proof that the alleged denial of core training had any impact on her career potential in its motion for summary judgment, and Dalton's response merely reasserted that she was denied training—she offered no evidence or argument whatsoever to show that the denial of training affected her employment or caused material harm to her job. Summary judgment is the "put up or shut up" moment of litigation, *Johnson v. Cambridge Industries, Inc.*, **325 F.3d 892, 901 (7th Cir. 2003)**, and Dalton's silence on the training claim speaks volumes. Because there's no indication that the denial of training rose to the level of an adverse action, judgment on the training claim is proper.

Dalton's next claim is that her resignation was actually a constructive discharge, and one motivated by discriminatory animus. The term "constructive discharge" refers to the situation in which an employer, without firing an employee, makes his working

8

conditions so miserable that he is driven to quit. *Hunt v. City of Markham, Ill.*, **219 F.3d 649, 655 (7th Cir. 2000).** Misery, at least of the actionable variety, can come in two forms—it can exist when an employee is exposed to egregious harassment, or it can exist when an employer's actions communicate to the employee that she will be terminated. *Chapin v. Fort-Rohr Motors, Inc.*, **621 F.3d 673, 679 (7th Cir. 2010).** Dalton makes no argument about the first type but says her case falls into the second, "termination is certain" category. That category has its limits, though—there's no constructive discharge without some indication that the potential discharge was imminent and unavoidable. *Wright v. Ill. Dep't of Children & Family Servs.*, **798 F.3d 513, 528-29 (7th Cir. 2015).** In other words, the axe must come quick and must be certain to fall; if it might not come because of the uncertainty of time or because of review by another, an employee should wait to see how things turn out before leaving on her own and using litigation to determine what would have happened. *Wright*, **798 F.3d at 529;** *Lindale v. Tokheim Corp.*, **145 F.3d 953, 956 (7th Cir. 1998).**

Dalton says that she was constructively discharged because the superintendent told her, after she filed her agency charge, that she could sign a new letter of resignation or be terminated after the Board meeting on March 18, 2013. At that point, though, Dalton's termination was far from certain: the Board may have abided by the superintendent's recommendation and terminated Dalton or refused to renew her contract, or it may have declined the superintendent's invitation and kept her around. It's of no moment that the Board typically abided by the superintendent's recommendations; what matters, for purposes of a claim of constructive discharge, is

9

that the Board had the ultimate authority, and that it could have gone the other way. *Cigan v. Chippewa Falls Sch. Dist.*, **388 F.3d 331, 333 (7th Cir. 2004).** Because the "prospect of being fired at the conclusion of an extended process is not itself a constructive discharge," Dalton's constructive discharge theory must fail. *Id.* **at 334.**

Even if the circumstances surrounding Dalton's March 2013 resignation somehow qualified as a materially adverse action for a discrimination claim, Dalton would still need to offer some evidence that the resignation was linked to discriminatory animus. *Henry v. Milwaukee County*, **539 F.3d 573, 587 (7th Cir. 2008).** All of Dalton's evidence of discrimination relates to actions by Principal Olson, which occurred in 2012 and seemingly have nothing to do with the March 2013 pressed resignation. It is true, of course, that the animus of an intermediate can be ported to the decisionmaker when the intermediate proximately caused the adverse act. But proximate cause doesn't exist in all cases where an intermediate is present—for the animus of an underling to be imputed to one higher up on the food chain, there must be some direct relationship between the injury asserted and the injurious conduct alleged that is neither too remote, purely contingent, or indirect. *Staub v. Proctor Hosp.*, **562 U.S. 411, 419-20 (2011).** In other words, if the underling with animus had no influence on the ultimate adverse action, the underling's animus wouldn't be ported to the decisionmaker. *See, e.g., Woods v. City of Berwyn*, **803 F.3d 865, 870 (7th Cir. 2015) ("[A] determination apart from the biased subordinate's recommendation can break the chain of causation.");** *Harris v. Warrick Cnty. Sheriff's Dep't*, **666 F.3d 444, 448 (7th Cir. 2012) (no animus imputation where there was nothing to link inappropriate**

10

**comments to the ultimate "termination" of "probationary employment");** *Nichols v. Michigan City Plant Dep't*, **755 F.3d 594, 604 (7th Cir. 2014) (statements that showed that the termination "had nothing to do" with the recommendations of the party with animus meant that the animus was "not a proximate cause" of the adverse act).**

There's nothing to suggest that Principal Olson had any influence on the superintendent's alleged decision to press Dalton's resignation in March 2013. Maybe proximate cause would exist if Dalton presented her claim to the Board or if she was coerced into resigning during her initial meeting with the superintendent in February to discuss the summative evaluation; in other words, maybe the principal's animus—which could have fed into the December 2012 summative evaluation that the Board would consider at its March 2013 hearing or that was the subject of the superintendent's first meeting with Dalton—could be linked to Board termination or a February coerced resignation. By Dalton's own account, though, neither of those events happened. The Board never considered the evaluation, and the superintendent didn't force Dalton into resigning or make any actionable threats against her until after she filed her agency charge. During the period preceding the charge, the superintendent told Dalton that she could take her chances with the Board and contest the evaluation, and only after Dalton filed her charge did he change his tune and press her resignation. That timeline—along with the superintendent's alleged statements tying his threats directly to Dalton's charge—mean that no reasonable jury could find that Olson's animus had anything to do with the superintendent's actions. *See, e.g., Hoppe v. Lewis University*, **692 F.3d 833, 842 n.2 (7th Cir. 2012) (animus would not be imputed where there was**

11

"no evidence" that party with animus "persuaded" decisionmaker to perform the adverse act); *Palermo v. Clinton*, 457 F. App'x 577, 580 (7th Cir. 2012) (no imputation where improper actions had no "relationship to the adverse employment action").

There being no discharge or link to discriminatory animus, the Board claims victory, and says the case should be dismissed. That's too hasty. When the Court views the record in the light most favorable to Dalton and takes all reasonable inferences in her favor, Dalton seems to claim that the superintendent was going to allow her to resign even if the Board found against her, told her that resignation after Board action was no longer an option after she filed her charge, allegedly tied that stick to her charge, and for good measure implied that he would poison her reputation if she pressed forward with her charge with the Equal Employment Opportunity Commission. A jury could find that these threats had the power to deter a reasonable employee from making a charge and were causally linked to the charge, and that's enough to proceed on a retaliation claim. *E.g., Pantoja v. Am. NTN Bearing Mfg.*, 495 F.3d 840, 849 (7th Cir. 2007); *Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 624 (7th Cir. 2002).

The Board seems to have one final argument concerning Dalton's retaliation claim. It suggests, by way of reference to "constructive discharge," that any claim linked to discharge wasn't presented in Dalton's agency charge, and thus isn't properly before the Court. This exhaustion argument must be rejected for two reasons. For one, the Board doesn't explicitly argue that any retaliation claim is unexhausted—in the only part of its summary judgment briefing on exhaustion, it references "discrimination," not retaliation, as it relates to the events surrounding Dalton's discharge. Exhaustion isn't

jurisdictional, *Salas v. Wis. Dep't of Corrections*, **493 F.3d 913, 922 (7th Cir. 2007)**, so the onus is on an employer to argue that a particular claim is unexhausted in a developed fashion in its motion for summary judgment. Because the Board doesn't argue that the retaliation claim is unexhausted, the retaliation claim may proceed.

Even if the Court were to construe the Board's one-paragraph exhaustion argument in its reply brief to apply to Dalton's retaliation claim, the exhaustion argument would fail. The Board is right to point out that Dalton's resignation wasn't explicitly referenced in the agency charge, but at the time that Dalton made her initial report to the agency, the resignation hadn't happened yet. Post-charge allegations that purportedly occurred because the employee started the agency process don't need to be exhausted via a new charge. *E.g.*, *Luevano v. Wal-Mart Stores, Inc.*, **722 F.3d 1014, 1030 (7th Cir. 2013)**; *Horton v. Jackson Co. Bd. of County Comm'rs*, **343 F.3d 897, 898-99 (7th Cir. 2003)**. That rule is premised on the notion that an employee probably won't proceed with a new charge when she's been stymied by the first; the employer's threat, and the possibility of future threats, serve as a strong deterrent to returning to the Commission. *Malhotra v. Cotter & Co.*, **885 F.2d 1305, 1312-13 (7th Cir. 1989),** *superseded by statute on other grounds as stated in Rush v. McDonalds Corp.*, **966 F.2d 1104, 1119-20 (7th Cir. 1992)**. That policy isn't served much in this case because Dalton was already terminated by the time she finalized her agency charge—she knew of the circumstances surrounding the resignation before she signed her charge and the employer no longer had any direct power over her—but the rule is a general one, and applies even when the policy isn't a perfect fit. *See id.* **at 1312.** By Johnson's account,

13

the threats occurred because the superintendent learned of her early report to the Commission, so the retaliation claim is properly before the Court.

## Disposition

For the reasons stated above, the Board's motion for summary judgment (Doc. 38) is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** as to Dalton's discrimination claims, and it is **DENIED** as to Dalton's retaliation claim.

**IT IS SO ORDERED.**

**DATED:  February 11, 2016**

/s/ **Michael J. Reagan**
**Chief Judge Michael J. Reagan**
**United States District Court**